### D. H. MARSHBURN ET ALS. v. ISAAC JONES ET ALS.

(Filed 27 November, 1918.)

**1. Statutes—Stock—No-Fence Law—"Change of Fence."**

The requirement of Revisal, sec. 1675, that the counties therein named may withdraw from the operation of the no-fence law, upon the conditions specified therein, if funds are provided by a tax levy, etc., for "changing the fence," is to provide against trespass by the running at large of stock into no-fence territory, and contemplates the change from the one system to the other; and the position is untenable that the statute is inapplicable when the fence has long since been lawfully removed or destroyed.

**2. Statutes—Repealing Statutes—Conflict—Stock—No-Fence Law—Fences.**

Where a statute amends Revisal, sec. 1675, by adding a part of another county to those therein named as having the right to withdraw from the stock law under certain conditions, and makes the building of the fence around the outer boundaries of the proposed district a condition precedent to the exercise of this right, repealing conflicting laws, the condition imposed by the later statute is not in conflict with the provisions of the section of the Revisal requiring that the expense of the fence be met by a tax levy, etc.

**3. Statutes—Public Policy—Stock—No-Fence Law—Fences.**

Our public policy with respect to the running of stock at large has been changed by our statutes on the subject of "no-fence" or stock laws, and the uniformity, with slight exception, of their application to the entire State; and while Revisal, sec. 1675, permits the counties therein enumerated to withdraw, upon certain conditions, from "stock-law" territory, this is to be done with regard to the rights of those districts where the law is effective, requiring that the districts withdrawing therefrom shall

erect the boundary fences necessary to keep the stock from trespassing upon the rights of the larger class of people within the "no-fence" territory. .

4. **Statutes—Repealing Statutes—Conflict—Stock—Fences—No-Fence Law.**

The act of 1917, placing Pender County among those specified in Revisal, sec. 1675, as having the right to withdraw from stock-law territory, etc., by repealing all laws in conflict therewith, does not affect the provision in the Public-Local Laws of 1915 relating to Pender County, and requiring as a condition precedent that, before its operative effect, a fence shall be built around the defined district.

5. **Injunction—Public Policy—Multiplicity of Suits—Stock—No-Fence Law.**

Where a proposed "no-fence" district has not been established according to the statute (Revisal, sec. 1675), equitable relief by injunction will lie against those who permit their stock to run at large and trespass upon the rights of others, upon the ground that such is against the well settled policy of the State; and that multiplicity of suits will be prevented.

HOKE and ALLEN, JJ., dissent.

THIS is an appeal by defendants from the order of *Stacy, J.,* continuing to the hearing a restraining order against the defendants allowing their live-stock to run at large in Pender County, which was heard by consent of all parties at Wilmington, 8 July, 1918.

*C. E. McCullen and C. D. Weeks for plaintiffs.*
*J. H. Burnett and John D. Bellamy & Son for defendants.*

CLARK, C. J. The General Assembly of 1913, chapters 248 and 276 placed the county of Pender within the public policy now prevailing over nine-tenths of the territory of this State, under what is known as the "no-fence" law, by which stock are not allowed to run at large on the lands of others than their owners, and requires that such owners shall fence up their stock instead of other people fencing them out in order to protect their crops.

The Legislature, by Public-Local Laws 1915, chapters 116 and 505, permitted the people of a certain part of Pender County to decide by vote whether they should return to the former system of letting stock run at large, but made such provision, if adopted by such vote, dependent upon the condition precedent, that the change should not take effect until a fence should be constructed by such territory to prevent the stock therein trespassing upon the people of the adjoining counties in which the owners of crops are protected by law against stock running at large. The act further provided that in the tax levy to build such fence the property of *natural persons* in Rocky Point Township should be exempted.

On such vote being held, the majority was cast for a return of the county (exclusive of Rocky Point Township) to the former system of stock running at large; but this Court held in *Keith v. Lockhart,* 171 N. C., 451, that the stock could not be turned out until the condition precedent of building the county fence to protect adjacent counties from the depredations of Pender County stock was complied with, and that funds to build such fence could not be raised under authority of that act because it exempted the property of natural persons in Rocky Point Township, which was a violation of Constitution, Art. VII, sec. 9, which requires that "All taxes levied by any county, city, town, or township shall be uniform and *ad valorem* upon all property in the same, except property exempt by the Constitution."

Under the laws in force, the property of the citizens is protected from stock running at large in the adjoining counties of Duplin, Sampson, Bladen, New Hanover, and Rocky Point Township in Pender; that is to say, in all the adjoining territory except Onslow on the east. By the terms of the Acts in question, it was expressly provided that *"It should not go into effect* until the fence was built," for the people of the adjoining territory were deemed by the Legislature to be entitled to the protection against stock running at large no matter whence they came, whether from their own territory or from the county of Pender.

Public-Local Laws 1917, ch. 99, amended Revisal, 1675, by placing Pender among the counties authorized to withdraw from stock-law territory upon a vote of the people upon compliance with certain provisions, and repealed "all laws in conflict therewith." The proposition was thereupon submitted to the people and adopted; but the fence around the territory in Pender voting to withdraw has not yet been built. Revisal, 1675, contains as the first proviso the following as a condition for the withdrawal of any territory from the stock-law territory after such vote has been had in its favor: *"Provided,* the expense incurred in changing the fence in such boundary, district, or territory so released be paid by the property holders in such boundary, district, or territory, and that the commissioners of the county levy the tax to pay the same on the property holders of such boundary, district or territory so released, but shall not be further liable for keeping up said stock-law fence."

Upon the election held after such amendment to Revisal, 1675, the majority voted to withdraw from the stock-law territory all the county outside of Rocky Point Township. The commissioners then attempted to levy a tax upon all the property in the county, outside of Rocky Point Township, to build such fence, but in *Godwin v. Comrs.* theye were restrained from levying the tax because it was laid upon all property, both real and personal, and was therefore void because not authorized by a vote and no appeal was taken. The commissioners then levied the

tax as an assessment, and this was enjoined because it was not authorized by the statute in question. *Hawes v. Comrs.,* 175 N. C., 268. Thereupon the defendants and others who wished their stock to run at large turned them out notwithstanding the provision that the stock-law fence must first be erected had not been complied with. There is no repeal, express or implied, of such requirement, for it does not conflict with Revisal, 1675. This conduct by defendants is enjoined by the order of the judge in this case. The action of the judge is in accordance with the law and must be sustained.

1. Revisal, 1675, under which the vote to change to stock running at large was held, contains a proviso that the "expense incurred in changing the fence" in territory wishing to return to the former condition of stock running at large must be paid by the property holders of such district. The defendants contend that such provision amounts to nothing because the fences in Pender having been abolished since 1 March, 1913, putting up such fence is not "changing the fence." This is "sticking in the bark." The evident intent, and the only possible meaning of the provision, is to require a fence to be put up for the protection of the territory left in the stock-law territory where the people are still to be protected against stock running at large. It means a "change" to the system where every man has to fence his crops against the stock of any one who permits them to run at large on his neighbors from the system now prevailing throughout almost the entire State of each man fencing up his stock on his own land to prevent their depredating on the property of others, for the section (1675) adds "they shall not be further liable for keeping up said stock-law fence."

2. The defendants contend that the provision repealing all laws in conflict with this provision, placing Pender under section 1675, repeals all need of fences on the outer boundary of the territory voting to change "its fence system," but clearly it does not repeal the provision in the act of 1915 that before stock shall be allowed to run at large in Pender the fence shall be erected to protect the people of Duplin, Sampson, Bladen, and New Hanover counties, and Rocky Point Township, nor the general law of the State, which prohibits stock running at large in their territory. Certainly this burden has not been put upon those people, who are many times as numerous, collectively, as the people of that part of Pender who have voted to return to the system of stock running at large. The latter are authorized to do so by the Legislature, but there is no provision that they may disregard the general policy of the State which protects the people outside from stock running at large. It is for that part of Pender which desires to let stock run at large to bear the expense of keeping their stock off no-fence territory, and not the people of the adjoining counties named.

3. The defendants contend that under the decisions of the Court in

MARSHBURN *v.* JONES.

WHITE—STOCK LAW

BLACK—FREE RANGE

*Jones v. Witherspoon*, 52 N. C., 555, and *Laws v. R. R., ib.*, 468, it was held that "by the public policy of this State the owners of stock are allowed the privilege of letting them run at large upon the property of others without being liable for damages done by them in such trespasses, and that, on the contrary, the owners of crops are liable for not keeping up fences to prevent trespasses from their neighbor's stock." This loses sight of the fact that these decisions were rendered prior to the war in 1860—fifty-eight years ago—and that in the meantime the public policy of the State as to fences, as evinced by numerous statutes and provisions, is now exactly the contrary.

*Judge Battle* said in *Laws v. R. R.*, 52 N. C., 468: "In England, where all, or nearly all, the lands are enclosed by the respective owners, the law requires that each proprietor shall keep his horses, cattle and other live-stock on his own premises; and if he permit them to go upon the land of another, it will be a trespass for which he will be held responsible. In the first settlement of this country by our ancestors, the condition of things was so entirely different that we were compelled to adopt another rule. Here only a very small part of the lands—that is, such as were actually in cultivation—were enclosed, and it was impossible for the proprietors to keep their comparatively numerous flocks and herds within the bounds of their enclosures. These flocks and herds were, therefore, allowed to go at large, and as early as the year 1777 every planter was compelled, under a heavy penalty, to keep a sufficient fence, at least five feet high, about his cleared ground under cultivation during crop time. This was manifestly done to prevent disputes and possible worse consequences arising from damages done to growing crops by the ravages of live-stock; and the act proceeds upon the assumption that the live-stock, whether consisting of horses, cattle, or hogs, were not to be kept up by their owners, but might lawfully be permitted to range at large."

By reason of conditions here formerly (contrary to the public policy in England) stock were allowed to run at large and the owners of crops were required to fence them against the trespasses of their neighbor's stock; now the owners of stock are required, as in England and in nearly all the other States of this country, to keep their stock from running upon the lands and crops of their neighbors. This has been changed by the great increase in arable land and in the value of crops as compared with the value of stock running at large and upon the experience that stock kept up, fed, and looked after by the owners are more valuable than those permitted to run at large, by the steadily growing scarcity of wood and other material and higher cost for labor required for fencing crops, the lesser expense of fencing in the stock, and the need of tick eradication. Besides, the principle applies in this case, as in all

others, *"sic utere tuo ut alienum non laedas"*—*i. e.,* "every man has a right to use his own, provided he does not do so to the injury of the rights of others."

Besides these and other arguments which have caused the extension of the "no-fence law," the "Commission for the Conservation of Food" have recently called attention to the fact that in this State last year $60,000 worth of stock were killed by railroad locomotives, a very small per cent of which loss occurred in the no-fence law counties, but almost entirely in that small part of the State in which the free range still obtains. At the same ratio, if stock had been allowed to run at large throughout the State, the destruction of stock and the loss of food thereby would amount annually to far over a half million dollars, for less than one-tenth of the State is now outside of the stock-law territory.

Our Legislature, in deference to the wishes of the people of any locality, have given them opportunity to declare whether they shall adopt the policy of each man fencing up his stock or of every man fencing out the stock of others. The result has been the growth of the stock law in North Carolina, until now it prevails over nine-tenths of the State; in fact, in all the State except in parts of half a dozen townships in the mountain sections where the cultivated fields are a negligible quantity and in a few counties along the Atlantic Coast, in most of which there are large areas of land not yet under cultivation, though even in this fringe of counties there are considerable areas in which the stock law prevails.

The public policy of the State is now the "no-fence law" with the exception of the small area mentioned. In Virginia and South Carolina, our nearest neighbors, the stock law has been adopted by each State for its entire area, and the same has been done in most of the other States, even in Texas and Kansas and the other prairie States, where formerly large areas were roamed over by herds of cattle and sheep. But even there the system has been broken up by requiring the owners of herds to pasture them on their own lands, which they must buy or rent for that purpose.

With the change of our public policy as to fences, the same rule that prohibits one man to let his stock run at large, unless he will fence in his outside boundaries, applies to counties and townships, so that the county or township or district which wishes to let its stock run at large can only do so by putting up a boundary fence to keep its stock within its own territory, so as not to permit them to run at large on those who adopt the present State policy of prohibiting trespasses by stock.

The fences in Pender have been down since their abolition by the act of March, 1913. If the people of that part of Pender who wish to return to the former system of letting their stock run at large in their own territory so vote, the Legislature has authorized them to do this,.

but there is nothing in that act which repeals the entire public policy of the State and permits them to turn their stock upon the people of the adjoining counties of Duplin, Sampson, Bladen, New Hanover, and Rocky Point Township. Before they can turn their stock out at large they must first protect all the adjacent stock-law territory. This is not a matter of property rights, but one of public policy, and the learned judge below properly continued the restraining order. If the stock owners in that part of Pender are allowed, by the absence of a county fence, to turn their stock loose upon the adjacent territory of the counties which have the stock law to guarantee them against such trespass, the stock of Pender could lawfully go at large to any distance and anywhere in the State.

In *Archer v. Joyner,* 173 N. C., 75, the Court said that whether the stock law or the anti-stock law should prevail and be put in force, with or without a fence, was in the power of the Legislature; but it must be distinctly noted that there is no provision in this act which authorizes any part of Pender County to turn its stock at large, without a fence around the boundaries of that part of its territory, to the detriment of the people outside who have the guarantee of the general policy of the State, as expressed by a long series of statutes, that their crops shall not be trespassed upon. The fact that this could have been done in 1860 does not put such authority into the act amending Revisal, 1675. If the Legislature had seen fit to so enact it is certain that it would not have been done without opposition from the representatives of the adjoining counties. The enactment of the statute is, therefore, evidence that if part of Pender County returns to the former system of stock running at large, it must do so subject to the right of the people of the adjacent counties to be protected by a fence around the territory which desires that the stock might run at large therein. The statute must be deemed to have been enacted in compliance with, and not in defiance of, the public policy of the State, which, except in excepted localities, now prohibits stock running at large. If free range was in force by reason of the enactment of the law of 1917, and nothing else was required, why did the defendants hold an election at all, and why did they seek to build a fence and to have the commissioners undertake to levy a tax and then an assessment?

In *Archer v. Joyner, supra,* the act extended the "no-fence law" over the larger part of Northampton County without requiring the new territory to put up a fence. This was a clear recognition that it was incumbent upon the people outside to keep their stock from running at large in the new stock-law territory, fully as much as the owners of stock within the new territory or from elsewhere.

The maxim already cited, *"Sic utere tuo ut alienum non laedas"*—i. e., "One should have liberty to use his own, provided he does not infringe upon the right of his neighbor to do the same," expresses the condensed wisdom of the ages and is founded upon inherent justice and common sense. If the people of any locality are empowered by the Legislature to let their stock run at large because a majority of the people in such locality so vote, this is restricted to their own borders and does not permit them to infringe the right of the people outside to be protected against such trespasses. The people of part of Pender County cannot by their vote impose their policy in this regard upon the people of the adjoining counties. The "no-fence" law being the public policy of the State, a part of Pender County cannot be allowed to disregard the rights of those outside, certainly in the absence of a statute of the General Assembly authorizing them to do so, "without putting up an outside fence," which has not been done. This has been recognized by repeated decisions of this Court as well as by statute.

In *S. v. Tweedy,* 115 N. C., 705, it is said: "It was competent for the town to enact the ordinance that no hogs should run at large within the town limits and to prescribe a penalty for the violation of such ordinance, and it would make no difference if the owner of the hog should live outside of such limits," citing *Rose v. Hardie,* 98 N. C., 44; *Hellen v. Noe,* 25 N. C., 493; *Whitfield v. Longest,* 28 N. C., 268.

When stock is found running at large in forbidden territory it is a violation of the law in that territory, and it makes no difference whether the owners live within the territory or without. Those living without the territory are not privileged to violate the law any more than those living within the territory. In *S. v. Mathis,* 149 N. C., 548, *Connor, J.,* held that "when the stock law is in force in a county, and the owner of stock over the dividing line in another county willfully permits his stock to run at large, it is not a valid defense that no fence had been built on the line to prevent the stock from the adjoining county running at large in the county where the trespass was committed."

This is quoted with approval in the late case of *Owen v. Williamston,* 171 N. C., 57, in which we held that "the owner of hogs is not authorized to violate the town ordinance by permitting his hogs to run at large either by the fact that he lived outside the town limits, nor because his hogs do," citing *S. v. Tweedy, supra; Aydlett v. Elizabeth City,* 121 N. C., 7; *Jones v. Duncan,* 127 N. C., 118.

That case also cites *S. v. Garner,* 158 N. C., 630, where the Court held that if the owner of cattle permits them to run at large in "free-range" territory, and they stray across the line into a "no-fence" territory, he is liable though he does not turn them out for that purpose. He purposely turns them out and is responsible for the fact that they

violate the law by straying into territory where stock are forbidden to run at large.

The statute law, Laws 1909, ch. 284, is to the same effect. "In all territory where the stock-law prevails and is in force, it shall be unlawful for any person or persons living outside of any stock-law territory to turn in, or in any way cause any stock to be turned in, in the inside of said stock-law territory without first obtaining the written consent of all the landowners living inside of said stock-law territory." And as said in *S. v. Garner, supra,* when the owner turns loose his stock outside of the stock-law territory and they wander off into stock-law territory to the detriment of people living within that territory, the owner of such stock is liable because he is presumed to know the consequences of his own conduct, for the stock do not know the territorial boundaries in which they are permitted to roam. The people who wish them to roam must put up such information as the stock can read, to wit, a visible and sufficient fence on the limits of the territory in which it is intended that they may legally stray.

The Public-Local Act allowing the people of certain parts of Pender County to express their wishes whether stock should run at large in that territory, and containing a provision repealing all acts conflicting therewith, cannot be reasonably construed to repeal the protection given by repeated statutes and by the present public policy of the State that such stock shall not run at large outside of the territory so voting, which cannot be prevented unless a fence is built by such territory to restrict the limits in which their stock may legally roam.

The plaintiffs, as citizens of the State as well as citizens of Pender, in enforcement of public policy, are entitled to have this injunction continued to the hearing. They are also entitled to it, as citizens of Pender, upon the ground that if they turn their stock out equally with their neighbors, if there is no such boundary fence put up by the community, they can be indicted and their stock impounded by the people of any stock-law territory into which they may roam, with the result that the plaintiffs will be compelled to fence in their own stock, as well as to fence in their crops against their neighbors, a double burden upon them.

It appears in this action that some of the plaintiffs and some of the defendants live in Rocky Point Township and the others in the other part of Pender County, and *Judge Stacy* well says that this proceeding is in the nature of a bill of peace to prevent a multiplicity of suits, and is a matter of widespread interest to the citizens of Pender. He finds that no fence has been built, nor the old ones restored in or around the territory sought to be released from the stock law, and that the original stock-law fence between Rocky Point Township and the rest of the county has been permitted to go down and is now out of repair, and.

that since the stock law in Pender was enacted 1 March, 1913, now nearly six years ago, a great many farmers, including all the plaintiffs, have allowed their fences to go down, have cleared new lands, and are cultivating the same without fences, and crops are now growing upon said lands without fences around them. He adjudges, as a conclusion, that the stock law is in force in Pender until the outside fence in the territory proposed to be released shall be built, and that great injury will result to the plaintiffs unless the temporary restraining order heretofore granted be continued until the final hearing, and that there is no adequate and sufficient protection at law. The judge also calls attention to the fact that the county commissioners have been restrained from levying a tax to build such outside fence in the case of Godwin against said commissioners because not voted for, and that no appeal was taken from such judgment, and the same is still in force. And further that in *Hawes v. Comrs., supra,* it has been held by this Court that the commissioners cannot levy an assessment upon real estate to pay the expense of erecting such fence because not authorized by the statute. His Honor also bases his ruling further upon the ground that the authority to change the territory back to free range is dependent upon the provisions that the expense of changing the fence shall be paid by the property holders in such territory; that the commissioners of the county levy the tax for that purpose. But the commissioners have been held to be without authority to levy an assessment, and they have been restrained from levying a tax.

His Honor, therefore, concludes his judgment: "It would seem, therefore, that the condition cannot be met by the commissioners under the judgment previously rendered and under the law now in force. It was not the intention of the Legislature to allow any district to withdraw from a stock-law territory simply by a majority of the votes being cast in favor of 'no-stock law' and without complying with the further provisions of the statute." He further says that these are conditions precedent, especially that of changing the fence, or else the commissioners would not have been required to levy a tax.

His Honor correctly, as we think, construes the purport of the statute as follows: "The spirit of this law and the intention of the Legislature would seem to be that whenever a given territory wishes to withdraw from the then existing no-fence law, the territory so withdrawing or changing its status with respect to the law then existing shall do so at its own expense, and shall so change the fences as to safeguard and protect the adjacent property owners from injury or damage incident to the change brought about by the action of the withdrawing territory."

The defendants base their claim that their cattle, hogs, goats, and sheep shall have the right of free pasture on the lands of others solely

upon the vote of the district in which they live, *i. e.,* Pender County, exclusive of Rocky Point Township, but such claim is contrary to the general policy of the State and to the status in Pender prior to such vote, which has no extra-territorial effect and cannot extend such claim of free pasture beyond the territory that has voted for it. There must be as a condition precedent a fence built by such territory around it, for the Legislature has not authorized the stock to run at large therein without the completion of such fence, which is necessary to protect the owners of crops in the adjoining. counties from depredations by such stock. For the protection of the plaintiffs and in due regard to the well-settled public policy of the State as now recognized, and for the prevention of a multiplicity of suits, and, as *Judge Battle* said in *Laws v. R. R.,* 52 N. C., 468, "To prevent disputes and possible worse consequences arising from damages done to growing crops by the ravages of live-stock," his Honor properly continued the injunction to the hearing.

Affirmed.